| | |
|---|---|
| District Court, Weld County, Colorado<br>Court Address:<br>901 9th Ave.<br>Greeley, CO 80631 | DATE FILED: September 11, 2023 2:27 PM<br>FILING ID: C2D63D69CC2B9<br>CASE NUMBER: 2023CV30705 |
| **JENNIFER DESOUSA,**<br>**Plaintiff**<br><br>v.<br><br>**UNIVERSITY OF NORTHERN COLORADO,**<br>**Defendants** | ▲COURT USE ONLY▲ |
| **Attorney for Plaintiff:**<br>Kelli Riley, Esq.<br>Riley Law LLC<br>1748 Topaz Drive<br>Loveland, Colorado 80537<br>Phone Number: 970-573-6442<br>E-mail: Kelli@RileyLawLLC.com<br>Atty. Reg. #: 44828 | Case Number:<br><br><br><br><br><br><br>Division |
| **COMMPLAINT AND JURY DEMAND** | |

**COMPLAINT AND JURY DEMAND**

Plaintiff Jennifer DeSousa (hereafter "Ms. DeSousa"), by and through her attorney, Kelli Riley of Riley Law, LLC, hereby submits this Complaint against University of Northern Colorado (hereafter "UNC"). In support of this complaint, Plaintiff states the following:

## STATEMENT OF THE CASE

1. Plaintiff Jennifer DeSousa was employed as the Dean of Students Specialist for Defendant from July 2018 until March 2022. Ms. DeSousa was subjected to a workplace environment in which she was consistently discriminated against on the basis of her age causing her significant emotional stress and anxiety. Ms. DeSousa was also subjected to sex discrimination based on gender stereotyping on the basis of her status as a mother, and she was not afforded the opportunities for overtime work which other similarly situated employees were given. Ms. DeSousa was terminated from her position when she

complained about being unfairly passed up for a position, for which she was duly qualified. The position was given to a much younger individual with less experience and qualifications, and this individual did not have children.

## PARTIES, JURISDICTION, AND VENUE

2. Plaintiff, Jennifer DeSousa, is a citizen of the State of Colorado and at all relevant times was a resident of Weld County, Colorado.

3. Defendant, University of Northern Colorado, is a University College with its principal place of business located at 501 20th St, Greeley, Colorado, Weld County.

4. This Court has jurisdiction over this proceeding pursuant to C.R.S. § 13-1-124.

5. Venue in this Court is proper pursuant to C.R.C.P. 98 because Defendant may be found in this County and the action arises out of events or circumstances that occurred in this County.

## FACTS

6. Ms. DeSousa was employed by the University of Northern Colorado from July of 2018 through March of 2022.

7. Ms. DeSousa was originally hired for the position of Executive Office Manager and Administrative Assistant for the Dean of Students office.

8. On or around August of 2020, Ms. DeSousa received a promotion for the position of Dean of Students Specialist.

9. The Dean of Students Specialist position increased Ms. DeSousa's salary rate from $34,842.00/year to $39,648.00/year.

10. Although Ms. DeSousa began performing the job duties of her new position immediately after receiving the promotion on or about August 2020, she did not receive compensation at the appropriate new rate until January of 2021.

11. Ms. DeSousa's direct supervisor, Dr. Colleen Sonnentag promised Ms. DeSousa that she would be compensated for the months she performed the additional job duties of her new role in the form of a back-pay check.

12. Dr. Sonnentag also promised that the college would revisit her compensation rate again within six months of her promotion.

13. For the duration of Ms. DeSousa's employment with UNC, neither of these promises were fulfilled.

14. The only form of retroactive payment Ms. DeSousa ever received was one month's worth of compensation for work she performed in December of 2020.

15. Ms. DeSousa detrimentally relied on Dr. Sonnentag's statements by performing additional job duties without additional compensation between August and November of 2020.

16. UNC received a benefit it would not have been entitled to had Ms. DeSousa not relied on Dr. Sonnentag's promises, and Ms. DeSousa incurred damages which are readily quantifiable and provable.

17. Ms. DeSousa was exposed to a work culture in which discriminatory statements about women with children were expressed openly by both her supervisors and colleagues.

18. One of the more extreme examples of this were the derogatory comments Ms. DeSousa witnessed between Assistant Dean of Students, Stephanie Jones, made about a co-worker,

suggesting that the co-worker's commitment to work and quality of work were subpar because she was distracted as a new parent.

19. Both Ms. DeSousa and her co-worker were the only parents in the office, and were furloughed for June and July 2020.

20. While on furlough, Dr. Sonnentag and Ms. Jones made plans for a partial return to office where staff would be working hybrid schedules, with only two people working in the office at any time as a COVID safety precaution.

21. When Ms. DeSousa returned to the office in August 2020, Ms. Jones was explaining the new hybrid schedule to her; Ms. Jones told her that the co-worker had requested special accommodations (because of concerns for her baby's health) and would most likely be working from home exclusively.

22. Ms. Jones expressed to Ms. DeSousa that she believed the requested accommodations of the co-worker were unfair.

23. Mr. Jones had expressed to Ms. DeSousa on several occasions that she believes special accommodations for parents are unfair.

24. Ms. Jones went on to state that she believed the co-worker was not going to do quality work or be productive in her position.

25. Ms. DeSousa heard similar comments about the co-worker's perceived lack of commitment to her position on several occasions, particularly in the mornings when they would meet to do case assignment.

26. There were often several negative comments about the co-worker's performance and being distracted by having a baby at home during these meetings, from both Dr. Sonnentag and Ms. Jones.

Ex. A-1

27. When talks of layoffs started, Ms. DeSousa asked Dr. Sonnentag if she would be considered for layoffs, to which she responded that if anyone would be laid off, it would be the other co-worker with the new baby. It was not explicitly stated at the time, but due to previous comments and conversations, she interpreted this comment to mean that the co-worker was being targeted because she was a new parent and pregnant.

28. That employee was subsequently laid off.

29. Ms. DeSousa was passed up for a position for which she was duly qualified and which was given to a much younger individual in their early 20s who had significantly less relevant experience or qualifications and did not have children.

30. Talks about this position began in summer of 2019, when the Dean of Students office relocated; however, this position was not formalized until the full return to campus (from COVID) in fall 2021.

31. Part of the rational for this move was being able to share a "hub" reception area with student staff and other departments.

32. The area would serve multiple areas, and would take over reception, intake, and the hiring, training, and supervision of student staff, all of which were duties of Ms. DeSousa's job.

33. Upon the full return to campus in fall 2021, these were still job responsibilities of Ms. DeSousa, and the plan was to take these job duties from Ms. DeSousa's position and move them to a newly created "Student Support Specialist" and rename Ms. DeSousa's current position "Dean of Students Specialist."

Ex. A-1

34. During a 1:1 with Dr. Sonnentag, Ms. DeSousa expressed that she had concerns about her ability to do the newly developed Student Support Specialist role *and* have to perform as a receptionist and intake without any student staff or assistance.

35. This is when Dr. Sonnentag told Ms. DeSousa that she had just received that green light to create and post the Student Support Specialist position and asked if Ms. DeSousa would apply.

36. Ms. DeSousa stated she would apply and Dr. Sonnentag responded that since she knew she was applying she would make sure to post the requirements so that she would qualify, meaning she would not list a Master's Degree as a qualification.

37. The Student Support Specialist position was posted at a pay rate $5,000 higher than what Ms. DeSousa was being paid as the Dean of Students Specialist.

38. Ms. DeSousa applied for the position under the reasonable impression, based on Dr. Sonnentag's statements, that the role had been created specifically for her.

39. Instead, the role went to a much younger individual who was less qualified than Ms. DeSousa.

40. Ms. DeSousa complained to Dr. Sonnentag about being unfairly passed up for the position for which she was duly qualified and that the position was given to someone with little experience or qualifications.

41. After Ms. DeSousa raised these concerns in late October 2021, Dr. Sonnentag's demeanor toward her changed completely.

42. Around this time, Ms. DeSousa also brought her concerns to Human Resources.

43. After the conversation Ms. DeSousa had with Human Resources, Dr. Sonnentag refused thereafter to communicate with Ms. DeSousa about her role in any meaningful way, including canceling many 1:1 meetings between them.

44. After canceling many of these meetings, Dr. Sonnentag met 1:1 with Ms. DeSousa to discuss the changes to the Dean of Student's Specialists position now that that the Student Support Specialist position had been filed.

45. Ms. DeSousa expected for the meeting to be about what duties would be reassigned to the Student Support Specialist position and the what new duties would be assigned to the Dean of Students position.

46. Instead, in the meeting Dr. Sonnentag presented Ms. DeSousa with a list of sudden and pretextual concerns about Ms. DeSousa's engagement and performance.

47. The meeting was cut short, and when Ms. DeSousa emailed Dr. Sonnentag asking for an opportunity to continue their discussion, she was told she needed to talk to Human Resources.

48. When Ms. DeSousa spoke with Sarah Chase in Human Resources about this, she was not provided with clarification on why she had been instructed to contact HR, but only given information about how to resign for her position.

49. The following week, on November 15, 2021, Ms. DeSousa had a follow up meeting with Ms. Chase.

50. During this meeting, Ms. DeSousa was informed by Ms. Chase that she had spoken with Dr. Sonnentag, and according to Dr. Sonnentag, Ms. DeSousa would be terminated if she did not become "more engaged."

Ex. A-1

51. Ms. DeSousa asked for clarification about what "more engaged" meant and was not given any, instead, Ms. Chase again gave her information about how to resign from her position.

52. Due to emotional distress caused by the threat of termination, Ms. DeSousa applied for and was granted medical leave of absence.

53. During Ms. DeSousa's leave of absence, there was a hiring decision made in the Dean of Students office that Ms. DeSousa believed to be unethical.

54. At this time Ms. DeSousa decided to file a formal complaint, and requested an external investigator handle her complaint due to internal conflicts of interest.

55. The investigator hired by UNC conducted an incomplete investigation; only part of the complaint was investigated and none of the witnesses given by either party were interviewed.

56. The investigator's determination was based solely on believing Dr. Sonnentag's version of events over Ms. DeSousa's version of events.

57. After the investigation, Ms. DeSousa was put on administrative leave and eventually terminated from her position on March 29, 2022.

## **FIRST CLAIM FOR RELIEF**
### **(COLORADO WAGE CLAIM ACT)**

58. Plaintiff incorporates by reference all of the above paragraphs.

59. At all relevant times, Defendant has been an "employers" within the meaning of the Colorado Wage Claim Act, § 8-4-101, et seq.

60. At all relevant times, Defendant employed "employees," including Plaintiff, within the meaning of the Colorado Wage Claim Act, § 8-4-101, et seq.

61. At all relevant times, Plaintiff performed duties that did not qualify for an exemption from overtime under the Colorado Wage Claim Act, § 8-4-101, et seq.

62. Plaintiff was not an exempt employee pursuant to the Colorado Wage Claim Act as enacted by COMPS #37 and COMPS #38.

63. Plaintiff was entitled to overtime compensation, rest breaks, and meal breaks, which she did not receive.

64. Her unpaid wages are estimated at $10,000.

65. As a result of the foregoing conduct, as alleged, Defendant violated Colorado Wage Claim Act. These violations were committed knowingly, willfully, and with reckless disregard of applicable law.

66. As a result, Plaintiff has been damaged in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (FAIR LABOR STANDARDS ACT)

67. Plaintiff incorporates by reference all of the above paragraphs.

68. At all relevant times, Defendant was an "employers" within the meaning of the FLSA.

69. At all relevant times, Defendant employed "employees," including Plaintiff, within the meaning of the FLSA.

70. Defendant made the decision to not pay wages corresponding to Ms. DeSousa promotion, violating FLSA.

71. Defendant did not allow Ms. DeSousa meal and rest breaks, or pay overtime pay, violating FLSA.

72. As a result of the foregoing conduct, as alleged, Defendants violated FLSA. These violations were committed knowingly, willfully, and with reckless disregard of applicable law.

Ex. A-1

73. As a result, Plaintiff has been damaged in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (DISCRIMINATION ON THE BASIS OF AGE – CADA)

74. Plaintiff incorporates by reference all of the above paragraphs.

75. Defendant's discharge of Plaintiff was motivated by her age, above 40, in violation of the Colorado Anti-Discrimination Act.

76. Defendant made the decision to allow/facilitate a work environment where Ms. DeSousa had to suffer through a work environment where it was joked about how "old" she was.

77. This environment forced Ms. DeSousa to regularly endure comments such as "Jen is 200 years-old", among other inappropriate commentary about being "old."

78. In addition to the hostile environment Ms. DeSousa had to endure because of her age, Ms. DeSousa was also passed for a promotion, which was a new position being created to move several of her current and previous duties to a new formalized role, and the job was given to a younger and much less qualified individual.

79. As a result of the foregoing conduct, as alleged, Defendant has violated CADA. These violations were committed knowingly, willfully, and with reckless disregard of applicable law.

80. As a result, Plaintiff has been damaged in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (DISCRIMINATION ON THE BASIS OF SEX AND RETALIATION – CADA)

81. Plaintiff incorporates by reference all of the above paragraphs.

82. Ms. DeSousa, as a woman, is a member of the class of persons protected from sex discrimination under CADA.

83. At all relevant times, Plaintiff performed the functions of her job competently and was qualified for her position with Defendant.

84. Plaintiff was subject to disparate treatment because she was not provided with opportunities to work on certain projects or given overtime opportunities that similarly situated employees were given because of her sex, gender, and status as a mother.

85. Plaintiff's sex, gender, and status as a mother, and her complaints to her supervisor and human resources about the same, were motivating factors in Defendant's conduct causing her damages.

86. Defendant is liable for the acts and omissions of its agents and employees.

87. Defendant, by and through its agents, discriminated against Plaintiff on the basis of her sex and in retaliation for her complaints about discrimination.

88. As a result of the foregoing conduct, as alleged, Defendant has violated CADA. These violations were committed knowingly, willfully, and with reckless disregard of applicable law.

89. As a result, Plaintiff has been damaged in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
**(Promissory Estoppel)**

90. On or around August 2020, Ms. DeSousa received a promotion which entitled her to a pay raise from $34,842.00/year to $39,648.00/year, a difference of $4,806.00/year.

91. Ms. DeSousa began performing the job duties of her new position immediately after receiving the promotion, with the promise from her supervisor that she would receive the pay increase.

92. She did not receive compensation at the appropriate new rate until January of 2021.

93. Ms. DeSousa was promised that she would be compensated for the months she performed the additional job duties of her new role in the form of a back-pay check.

94. This back-pay check was never fully paid to Ms. DeSousa.

95. Plaintiff detrimentally relied on these promises when she performed additional more burdensome duties and did not receive the increased pay.

96. Plaintiff's unpaid estimated wages for the work performed in her new position that was never paid are estimated to be $1,602.00.

97. Plaintiff seeks statutory interest.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of her and against Defendants as follows:

A. Awarding Plaintiff declaratory and/or injunctive relief as permitted by law or equity;

B. Awarding Plaintiff compensatory damages, attorneys' fees and litigation expenses as provided by law;

C. Awarding Plaintiff pre-judgment, post-judgment, and monetary interest as provided by law;

D. Awarding Plaintiff liquidated damages and/or statutory penalties as provided by law; and

E. Awarding Plaintiff such other and further relief as the Court deems just and proper.

Plaintiff demands a trial by jury.

Respectfully submitted this 11th day of September, 2023.

Respectfully submitted,

*/s/Kelli Riley*
Kelli R. Riley, Esq.
Atty. Reg. # 44828
RILEY LAW LLC

Ex. A-1

1748 Topaz Drive
Loveland, CO 80537
kelli@rileylawllc.com
Attorney for Plaintiff

Ex. A-1